## THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br>                          Plaintiff, <br><br> v. <br><br> THE UNITED STATES ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL ROBERT L. VAN ANTWERP, in his official capacity; and COLONEL ROGER A. WILSON, JR., in his official capacity, <br><br>                      Defendants. | Case No. 10-CV-2068 JTM/DWB |

### INTRODUCTION

1.      This action challenges the failure of the federal government to comply with federal environmental laws before authorizing the construction and operation of a massive railyard and distribution and warehousing center in Kansas.  This project will generate substantial localized air pollution, exacerbate existing air pollution problems in the Kansas City metropolitan area, and result in significant public health impacts.

2.      More specifically, this action challenges the decision of defendant the United States Army Corps of Engineers and its officials (collectively, the "Corps") to issue a permit under Section 404 of the Clean Water Act for the discharge of dredged or fill material (hereinafter the "Permit") to Burlington Northern Santa Fe Railway Company ("BNSF") in violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), and NEPA implementing regulations, 40 C.F.R. § 1500.1 *et seq.*, 30 C.F.R. §§ 230.1 *et seq.* (2008).

3.      The Permit is necessary for BNSF's construction and operation of a nearly 500 acre intermodal facility ("Gardner IMF" or the "Project") in Johnson County, near the city of Gardner, Kansas.

4.      Among other things, Gardner IMF operations will consist of the transfer of cargo from rail to trucks and vice versa.  Such operations rely on the use of line haul and switching locomotive engines, off-road equipment used primarily to lift containers off trains or trucks, transportation refrigeration units that are designed to keep perishable cargo stored in shipping containers cool, and trucks moving containers on or off site.  With very few exceptions, such vehicles and equipment will be diesel-powered, and result in the release of toxic diesel exhaust.

5.      The Gardner IMF will also be the impetus for the construction and operation of a massive warehouse and distribution center (the "Logistics Park") that will provide space for cargo owners to store freight.  The Logistics Park will be located adjacent to the Gardner IMF and could encompass 7 to 12 million square feet of warehousing space.  Operations at the Logistics Park will involve the use of trucks to move cargo to, from, and within the facility, off-road equipment used to lift containers off and on trucks, and transportation refrigeration units.  Such vehicles and equipment will be diesel-powered, and result in the release of toxic diesel exhaust.  The Logistics Park will also generate a large amount of non-truck (e.g., passenger vehicle) traffic to and from the facility, which will also generate air pollution.

6.      The Gardner IMF and Logistics Park are intended to enable the Kansas region to receive increasing levels of freight that is shipped by rail predominantly from California ports to Kansas and regions beyond, including Chicago.  At full build-out of the Project, over 110 trains may operate through the Project site every day, in addition to nearly 33,500 trucks and other vehicles that will travel to the Gardner IMF and Logistics Park daily.

7.     BNSF already operates at least two existing railyards in Kansas City—the Murray and Argentine Yards.  The Project will relocate the intermodal operations at the Argentine Yard to the Gardner IMF and more than double those operations.  All other operations at the Argentine and Murray Yards, however, will remain, resulting in at least three railyards operating simultaneously in neighboring counties.

8.     The Project will greatly affect local and regional air quality.  The diesel-powered vehicles and equipment used at the Gardner IMF and Logistics Park will emit, among other pollutants, ozone forming oxides of nitrogen and volatile organic compounds, and particulate matter.  Inhalation of ozone and particulate matter are associated with a host of health ailments, including premature death, aggravated asthma and other respiratory illnesses, increased risk of cancer, and heart disease.

9.     In 2007, air quality in the Kansas metropolitan region exceeded federal air quality standards for ozone, a potent air pollutant and primary component of smog.  In connection with the Project, the United States Environmental Protection Agency ("EPA") modeled fugitive dust emissions—a type of particulate matter pollution, and found that such levels exceeded federal air quality standards for particulate matter by approximately four to ten times.

10.    Despite these and other significant impacts that were brought to the Corps' attention by the Plaintiff and other stakeholders, including government agencies, leading universities, and environmental organizations, the Corps issued the Permit to BNSF on December 18, 2009 without completing an environmental impact statement ("EIS").  NEPA requires the preparation of an EIS for major federal actions that significantly affect the human environment.  Instead, the Corps prepared an environmental assessment ("EA"), a document intended under NEPA to provide a succinct basis for determining whether a full EIS is necessary, followed by a "finding of no significant impact" ("FONSI").  The EA, on which the Corps based its FONSI, fails to consider the

3

full impact of the Project on local and regional air quality and public health, and is otherwise factually and analytically flawed.

11.     Accordingly, this action focuses on the Corps' failure to adequately assess the air pollution impacts of the Project.  It alleges that the Corps violated NEPA and the APA by granting the Permit without completing an EIS, and by preparing an inadequate EA.  This action requests declaratory and injunctive relief, including a court order staying the Permit unless and until the Corps completes a full EIS consistent with the requirements of NEPA and the APA.  While this action does not address the non-air quality impacts of the Project, Plaintiff remains concerned over the Project's e.g., water quality impacts, and reserves the right to amend its complaint to add additional claims and allegations to that effect.  Notably, a related complaint has been filed that covers the Project's water quality impacts.[1]

## PARTIES

12.     Plaintiff Natural Resources Defense Council, Inc. ("Plaintiff" or "NRDC") is a national, not-for-profit membership corporation organized under the laws of the State of New York, with offices in New York; Washington, D.C., Los Angeles; San Francisco; Chicago; and Beijing China.  Founded in 1970, NRDC has more than 445,000 members nationwide, including over 3,100 members who live in Kansas (739 of whom live in Johnson County and 11 of whom who live in Gardner).  NRDC is dedicated to the preservation, protection, and defense of the environment, public health, and natural resources.  NRDC is actively involved in efforts to reduce the environmental, public health and community impacts of our nation's goods movement system—the network of ships, trucks, and trains that move freight in and out of our country.  NRDC has also long been active in working to protect air quality and specifically, to reduce the public health effects

---

[1]     On January 7, 2010, a related complaint was filed against the Corps and BNSF concerning the same Project.  *See Hillsdale Environmental Loss Prevention, Inc. et al. v. United States Army Corps of Engineers, et al.*, Case No. 2:10-cv-02008-CM-DJW (D. Kansas).

generated by diesel exhaust.  On August 12, 2009, NRDC submitted detailed comments to the Corps on the draft EA, and has through other correspondence communicated to the Corps its concerns over the potential adverse impacts of the Project and the need for the preparation of an EIS under NEPA.

13.     NRDC brings this action on behalf of its members who live, work, and recreate in Kansas, around the City of Gardner, Johnson County, and surrounding areas and who will suffer the harmful effects of the Project.  The excess air pollution and other deleterious environmental effects of the Project will injure the health of Plaintiff's members, their livelihood, and their recreational and aesthetic enjoyment of the region.  Further, the Corps' failure to adequately study and disclose all of the environmental impacts of the Project has effectively denied Plaintiff's members access to relevant information about the Project.  The declaratory and injunctive relief Plaintiff seeks under NEPA will redress the injuries to Plaintiff's members by requiring the Corps to consider fully and provide to the public and other government decisionmakers information about the anticipated environmental and public health impacts of the Project, and to develop alternatives and mitigation measures that will minimize or avoid those impacts.

14.     Defendant United States Army Corps of Engineers is an agency of the Unites States Government.  As a federal agency, the Corps must comply with federal law, including NEPA.  The Permit was issued by the Corps' Kansas City District.

15.     Defendant Lieutenant General Robert L. Van Antwerp ("General Van Antwerp") is the Chief of Engineers and Commanding General of the Corps.  He oversees the activities of the Corps and its districts, including the Kansas City District, and is responsible for ensuring that the Corps, including officials and employees under his supervision, complies with all applicable federal laws, including NEPA.  Defendant General Van Antwerp is sued in his official capacity.

16.     Defendant Colonel Roger A. Wilson, Jr. ("Colonel Wilson") is the District Commander of the Corps' Kansas City District.  He oversees the activities of the Kansas City District of the Corps, and is responsible for ensuring that the Corps, including officials and employees under his supervision, complies with all applicable federal laws, including NEPA. Defendant Colonel Wilson signed the Permit, and is sued in his official capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgment), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

18.     Venue in this Court is proper under 28 U.S.C. § 1391(e) because this is a civil action brought against an agency of the United States and its officers and employees acting in their official capacities and under the color of legal authority, the FEA and Permit were issued in this district by the Corps' Kansas City District, and the Project is located within this district.

## LEGAL BACKGROUND

### National Environmental Policy Act

19.     NEPA is the United States' "basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  Among the purposes of the statute are to "insure that environmental information is available to public officials and citizens *before* decisions are made and actions are taken"; and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id.* § 1500.1(b)-(c) (emphasis added).

20.     To achieve these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement – the EIS – must describe,

among other things:  (1) the environmental impact of the proposed action, (2) any adverse environmental effects that cannot be avoided should the proposal be implemented, and (3) alternatives to the proposed action.  *Id.* § 4332.  In preparing the EIS, agencies must facilitate the participation of other agencies and the public.  *Id.*; 40 C.F.R. §§ 1501.7, 1503.1, 1503.4.

21.     The Council on Environmental Quality ("CEQ"), established under NEPA within the Executive Office of the President to be responsible for coordinating federal environmental efforts, has promulgated regulations implementing NEPA.  40 C.F.R. §§ 1500-1508.  The Corps' own NEPA policies are set forth in 33 C.F.R. §§ 230.1 *et seq.*

**When an EIS is required**

22.     The CEQ regulations define "major federal action" to include "actions with effects that may be major. . . .  Major reinforces but does not have a meaning independent of significantly." 40 C.F.R. § 1508.18.  "Significantly" requires considerations of both context and intensity.  *Id.* § 1508.27.  "Context" means that the significance of an action must be analyzed from several perspectives, such as "the affected region, the affected interests, and the locality."  *Id.* § 1508.27(a). "Intensity" refers to the severity of the impact.  *Id.* § 1508.27(b).

23.     In assessing "intensity" to determine whether an EIS is required, the CEQ regulations direct agencies to consider, among other factors, the degree to which the proposed action affects public health, *id.* § 1508.27(b)(2); unique characteristics of the geographic area such as proximity to park lands, wetlands, or prime farmlands, *id.* § 1508.27(b)(3); the degree to which the effects on the quality of the human environment are likely to be highly controversial, *id.* § 1508.27(b)(4); the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, *id.* § 1508.27(b)(5); whether the action is related to other actions with cumulatively significant impacts, *id.* § 1508.27(b)(7), and whether the action

threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment, *id.* § 1508.27(b)(10).

24.     Under the CEQ regulations, an EA is defined as a "concise public document . . . that serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  *Id.* § 1508.9.

25.     CEQ guidance states that although the NEPA regulations "do not contain page limits for EAs, the Council has generally advised agencies to keep the length of EAs to not more than approximately 10-15 pages."  "Forty Most Asked Questions Concerning CEQ's NEPA Regulations," Q36a., 46 Fed. Reg. 18026, 18037 (Mar. 23, 1981); *see also* 33 C.F.R. § 230.10.  "In most cases . . . , a lengthy EA indicates that an EIS is needed."  46 Fed. Reg. at 18037.

**What must be included in an EIS**

26.     Pursuant to CEQ regulations, an EIS must include, among other things:  (1) a "full and fair discussion" of the significance of all "direct," "indirect," and "cumulative" effects of the action, 40 C.F.R. §§ 1502.1, 1502.16(a)-(b), 1508.25(c); (2) a rigorous and objective evaluation of all reasonable alternatives to the action, including "no action," *id.* §§ 1502.14, 1502.16(d), 1508.25(b); and (3) a discussion of "means to mitigate adverse environmental impacts."  *Id.* § 1502.16(h).

27.     "Effects" include ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative.  *Id.* § 1508.8.  "Direct effects" are caused by the action and occur at the same time and place.  *Id.* § 1508.8(a).  "Indirect effects" are reasonably foreseeable effects caused by the action, but later in time or farther removed in distance.  *Id.* § 1508.8(b).  These may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  *Id.*

28.     An EIS must analyze "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).  A "cumulative impact" is defined as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  *Id.* § 1508.7.

29.     A discussion of alternatives to the proposed action, including the "no action" alternative, is "the heart" of an EIS.  *Id.* § 1502.14.  The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," *id.* § 1502.14(a), and must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits," *id.* § 1502.14(b).

**Public review requirements**

30.     As distinct from an EA, preparation of an EIS requires an "early and open process for determining the scope of issues to be addressed."  40 C.F.R. § 1501.7.  This scoping process requires the agency to invite the participation of affected agencies and "other interested persons (including those who might not be in accord with the action on environmental grounds)."  *Id.* § 1501.7(a)(1); 33 C.F.R. § 230.12.

31.     An agency must prepare a draft EIS in accordance with the scope decided upon in the public scoping process.  40 C.F.R. § 1502.9(a).  After preparing the draft EIS and before preparing a final EIS, the agency must solicit comments from "any Federal agency which has jurisdiction by law or special expertise," "[a]ppropriate State and local agencies," and the public, "affirmatively soliciting comments from those persons or organizations who may be interested or affected."  *Id.* § 1503.1(a).

32.     After the public comment period, an agency must prepare a final EIS based on its assessment and consideration of the comments received from the public, as well as other relevant

Federal, State and local agencies, on the draft EIS, "both individually and collectively." *Id.* §

1503.4(a).  All substantive comments received on the draft EIS (or summaries of such comments if

they are "exceptionally voluminous") must be appended to the final EIS.  *Id.* § 1503.4(b).  An agency

must respond to comments by such means as modifying alternatives; developing and evaluating new

alternatives; supplementing, improving, or modifying its analyses; making factual corrections; and/or

explaining in detail why the comments do not require further response.  *Id.* § 1503.4(a); *see also id.* §

1502.9(b).

**Administrative Procedure Act**

33.     The APA governs judicial review of an agency's compliance with NEPA.  A court

shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary,

capricious, and abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

**Gardner IMF and Logistics Park Construction and Operations**

34.     In March 2007, BNSF filed an application with the Corps for a Section 404 Clean

Water Permit that would authorize the construction of the Gardner IMF.  The Permit is necessary

for BNSF's construction and operation of the Project because the Project will impact U.S.

jurisdictional waters, including 17,302 linear feet of streams, 4.61 wetland acres, and 16.65 acres of

open waters.

35.     Construction of the Gardner IMF will occur over several years.

36.     Gardner IMF operations will consist of the transfer of cargo from rail to trucks and

vice versa.  Such operations involve the use of line-haul and switching locomotive engines idling and

moving through the facility, off-road equipment used primarily to lift containers off trains or trucks,

transportation refrigeration units, and trucks moving containers on or off site.  With the exception

of electric cranes, all off-road equipment, in addition to the locomotive engines, trucks, and

transportation refrigeration units used to sustain Gardner IMF operations, will be diesel-powered, and thus, emit diesel exhaust.

37.     The Project will encompass approximately 500 acres, and is expected to handle up to 415,000 "lifts" in its opening year.  A "lift" consists of a movement of a container from one transportation mode to another, e.g., from a train to a truck or vice versa.  The Corps reports that the number of lifts at the Gardner IMF will increase to up to 495,000 within five years, and 870,000 within twenty years after the Project opens.  The lift capacity of the Gardner IMF is unreported.

38.     As a result of the Project, movement of cargo by rail on BNSF's mainline tracks will increase.  The Federal Highway Administration predicts that fifteen years after the opening of the Gardner IMF, 110 trains will run on the mainline tracks utilized by the Gardner IMF per day.  These trains will transport goods from Los Angeles to Chicago and vice versa, and stop in Kansas to pick up and drop off cargo from the Kansas region.

39.     The Gardner IMF will generate thousands of vehicle trips to the Project site.  One of the purposes of the Gardner IMF is to attract intermodal freight from the Kansas City metropolitan area, which is approximately 30 miles away from the Project site.  As a result, trucks and vehicles can be expected to travel to and from the Kansas City metropolitan area to the Gardner IMF to pick up and deliver cargo.

40.     In the Project's opening year, it will generate nearly 3,000 one-way vehicle trips per day.  This figure represents both trucks and passenger vehicles, as do all other references to "one-way vehicle trips per day".  In year five, 3,500 one way vehicle trips will be generated per day, and in year twenty, 6,000 vehicle trips will be generated per day.  In terms of trucks alone, the Corps estimates that nearly 340,000 trucks will travel to the Gardner IMF in its opening year.

41.     BNSF operates existing railyards in the Kansas City metropolitan region.  For instance, BNSF operates the Argentine Yard and Murray Yard.  The Argentine and Murray Yards

are approximately 13 miles away from each other, and located in Kansas City.  The Argentine Yard is located in Wyandotte County and the Murray Yard is located in neighboring Clay County.

42.     The Argentine Yard is used for several types of operations:  intermodal, fueling and inspection, crew change, and as a classification yard.  In 2007, the Argentine Yard was the busiest classification yard in BNSF's system, processing approximately 1,600 rail cars per day.  The intermodal operations at the Argentine Yard take place on approximately 45 acres of land, and in 2007, that yard performed approximately 370,000 lifts.

43.     Operations at the Murray Yard primarily include the handling of coal and grain trains, with some industry and merchandise trains, and interchanging stations for coal.  While the Murray Yard was once used as an intermodal facility, currently, there are no intermodal operations at that yard.

44.     The Project will relocate all of the intermodal operations at the Argentine Yard to the Gardner IMF and greatly expand those operations.  The acreage for the Gardner IMF is approximately ten times the size of the acreage used for intermodal operations at the Argentine Yard, and after twenty years of operation, the Gardner IMF is projected to perform more than double the number of lifts performed by the Argentine Yard in 2007.  As a result, the Project will bring greater rail and truck traffic to the Gardner area than what presently exists.

45.     After intermodal operations at the Argentine Yard are relocated to the Gardner IMF, BNSF will continue to use the Argentine Yard as a fueling and inspection stop, crew change location, and as a classification yard.  Operations at the Murray Yard will also continue.  As a result, BNSF will operate at least three railyards simultaneously in neighboring counties.

46.     The Gardner IMF is also the impetus for the construction and operation of a massive warehouse and distribution center—the "Logistics Park"—that will be located adjacent to the Gardner IMF.  The Logistics Park could encompass 7 to 12 million square feet of warehousing

space for cargo owners to store freight.  Operations at the Logistics Park will involve the use of
trucks to move cargo to, from, and within the facility, off-road equipment used to lift containers off
and on trucks, and transportation refrigeration units.  These vehicles and equipment are generally
diesel-powered, and emit toxic diesel exhaust.

47.    The Logistics Park will be constructed in phases.  Approximately 400,000 to 600,000
feet of warehouse space will be available for lease at the time the Gardner IMF opens.  Five years
after the Gardner IMF opens, warehouse capacity of nearly 3 million square feet will be available for
lease.  Additional warehouse space is available and the Logistics Park development could reach 7.1
to 12 million square feet of warehouse capacity.

48.    The Logistics Park will also generate thousands of additional vehicle trips in and out
of the area.  In the Gardner IMF's opening year, the Logistics Park will generate 2,315 one way
vehicle trips per day.  In year five of the Gardner IMF, the Logistics Park will generate 11,000 one
way vehicle trips per day.  As a result, the Logistics Park will also bring significantly greater truck
traffic to the Gardner area than what presently exists, as trucks shuttle cargo from the Logistics Park
to various regional markets, and vice versa.

49.    Combined, the Gardner IMF and Logistics Park will generate 5,215 one way vehicle
trips per day in year one of operations, 14,500 one way vehicle trips per day in year five of
operations, and 17,000 one way vehicle trips per day in year twenty of operations.  If the Logistics
Park is developed to have warehousing capacity of 7.1 million square feet, the Gardner IMF and
Logistics Park will generate 33,400 one way vehicle trips per day.

50.    The site for the Gardner IMF and Logistics Park consists predominantly of
agricultural open space, fields, and riparian vegetation.  The Project and Logistics Park would replace
this natural setting with large industrial operations consisting of multiple rail tracks, cranes,

buildings, warehouses, roadways, and storage areas for trailer parking, shipping containers, and chassis parking.  The Gardner IMF will operate twenty-four hours a day, seven days a week.

**Air Pollution Generated by the Gardner IMF and Logistics Park**

51.     Given that the purpose of the Gardner IMF and Logistics Park is to increase freight movement by rail and truck through the Kansas City metropolitan area, the air pollution generated by the Project will not be confined to the Project site.  As a result, construction and operation of the Gardner IMF and Logistics Park will create local and regional air pollution, and exacerbate Kansas' existing air pollution problem.

52.     In February 2009, the state of Kansas recommended to EPA that Johnson County and Wyandotte County be designated as "nonattainment" for EPA's "8-hour" national ambient air quality standard for ozone.

53.     Between 1978 and 1992, Johnson and Wyandotte Counties were designated as nonattainment with respect to EPA's prior "1-hour" ozone standard that has since been repealed.

54.     The Corps made no attempt to quantify the air pollution generated by the construction of the Project.  Further, as discussed below, operational emissions were underestimated.  Nonetheless, the EA reports that in its opening year, Gardner IMF operations will generate nearly 6 tons of particulate matter ("PM"), 120 tons of oxides of nitrogen ("NOx"), 16.5 tons of volatile organic compounds ("VOC"), and approximately 2.5 tons of sulfur oxides ("SOx").

55.     PM, NOx and SOx are known to cause premature death, aggravated asthma and other respiratory illnesses, increased risk of heart disease, and other health ailments.

56.     The state of California classifies diesel PM as a "known" carcinogen.  U.S. EPA characterizes diesel PM as a "likely" carcinogen.

57.     VOCs are often toxic and can react with other pollutants, including NOx, in the presence of sunlight to form ozone, commonly known as "smog".

14

58.     Ozone is associated with premature death and contributes to respiratory and pulmonary illnesses, among other health ailments.

59.     EPA modeled one form of PM—fugitive dust emissions—from Project operations after it noticed that the Corps had omitted this large source of PM from an early draft of its air dispersion analysis.  Even though EPA's modeling did not include other types of PM, such as vehicle exhaust and brake and tire wear, EPA discovered that the Project's emissions of PM would exceed federal standards by approximately four to ten times.

60.     The EA asserts that fugitive dust emissions will remain below significance levels because BNSF entered into a mitigation monitoring agreement with the Kansas Department of Health and Environment.  This agreement was reached after the draft EA was issued but before the Corps' decision on the Permit.  Pursuant to this agreement, PM will be monitored and mitigation will be adopted if air quality monitoring demonstrates that certain PM standards are exceeded.

61.     The agreement, however, is ineffective to ensure PM emissions will remain below significance levels.  The term of the agreement is for a small fraction of the life of the Project, and lacks both specificity and adequate enforcement.

62.     Other measures included in the Project to address air pollution are similarly ineffective.

63.     Preliminarily, no measures were included in the Project to reduce air pollution from the construction of the Project.  This is the case even though vehicles and equipment that meet stringent EPA emissions standards and/or are powered by alternative fuels can be used to construct the facility, which can drastically reduce construction emissions.

64.     Few meaningful measures were adopted to reduce the Project's operational emissions.  The majority of measures included in the Project to address air pollution are "efficiency" measures aimed at allowing cargo to be moved faster through the facility.

15

65.     While the EA states that BNSF has begun installing idling controls on its existing locomotive fleet, the EA is silent on what percentage of locomotives actually utilizing the Project site will have such controls.

66.     BNSF primarily relies on natural fleet turnover of older, more polluting engines, and EPA regulation of new engines to reduce emissions from the Project over the course of the Project's first twenty years.

67.     Measures exist now, however, to help ensure that Project operations are cleaner when the Project opens.  Plaintiff and other stakeholders, including EPA and the Kansas Department of Health and Environment, advised the Corps of available measures that would significantly reduce air pollution from the Project, including:

a.     Technologies and measures that reduce emissions from locomotives, such as, diesel electric hybrids, multiple engine generator sets, use of alternative fuels, diesel particulate filters, selective catalytic reduction, idling shut-off devices, and idling exhaust hoods;

b.     Technologies and measures that reduce emissions from on-road trucks, such as truck electrification stops, alternative fuel trucks, electric trucks, trucks that meet the most stringent emissions standards, idling restrictions, retrofit devices, and energy efficiency measures; and

c.     Technologies and measures that reduce emissions from non-road trucks, cargo handling equipment, and transportation refrigeration units, such as fleet modernization programs, use of electric equipment, retrofit devices, idling restrictions, and use of alternative fuel equipment.

68.     These measures, among others, could have been included within the Project, or analyzed as a Project alternative, but were not.

69.     The Corps is familiar with the efficacy of these measures, as similar measures have been included within joint environmental documents prepared by the Corps and local government agencies in California in connection with port expansion projects subject to NEPA.

70.     Operations at the Gardner IMF and Logistics Park will also result in emissions of greenhouse gases ("GHGs").  GHGs are gases that trap heat in the atmosphere.

71.     The Corps, however, made no attempt to quantify the amount of GHGs generated by the Project.

72.     Human activities, including fossil fuel combustion from vehicular transportation, have elevated the concentration of GHGs in the atmosphere above natural levels.

73.     The World Resources Institute's GHG Protocol Initiative identifies six GHGs generated by human activity that are believed to be contributors to global warming.  They include: carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride.

74.     There is a close relationship between the increased concentration of GHGs in the atmosphere and global temperatures.  Scientific evidence indicates a trend of increasing global temperatures near the earth's surface over the past century due to increased human-induced levels of GHGs.

75.     GHGs differ from criteria pollutants in that GHG emissions do not cause direct adverse human health effects.  Rather, the direct environmental effect of GHG emissions is the increase in global temperatures, which in turn has numerous indirect effects on the environment and humans.  For example, some observed changes include shrinking glaciers, thawing permafrost, later freezing and earlier break-up of ice on rivers and lakes, a lengthened growing season, shifts in plant and animal ranges, and earlier flowering of trees.  Other, longer term environmental impacts of global warming may include sea level rise, changing weather patterns with increases in the severity of

17

storms and droughts, changes to local and regional ecosystems including the potential loss of species, and a significant reduction in winter snow pack and precipitation in some areas.  These changes have environmental, economic, and social consequences, possibly including increased spread of disease, fresh water shortages, significant displacement of populations, and changes to agricultural output.

**The Corps' Decision to Issue the Permit Without Preparing an EIS and the Public's Response**

76.     On August 13, 2007, the Corps and Kansas Department of Health and Environment issued a public notice that BNSF applied for the Permit in connection with the Project.

77.     The Corps held a public meeting on the Project on September 26, 2007.

78.     On July 10, 2009, the Corps issued a draft EA for the Permit activities and stated that it had made a preliminary determination that the Project would not have a significant adverse effect on the quality of the human environment, and thus, preparation of an EIS was not required.

79.     The Corps received approximately 380 comments on the draft EA, and over 30 verbal and written comments on the Project in response to its August 2007 public notice and September 2007 public hearing.  Public comments on the Project included comments from government agencies, universities, environmental organizations, and private individuals.

80.     Many of those who commented on the Project expressed concern over the size, nature and effect of the Project on the environment and disputed the Corps' findings in the draft EA that the Project would not result in significant environmental impacts.  Substantial comments expressed concern over the Project's impacts on local and regional air quality and requested that the Corps perform a full EIS.

81.     On December 18, 2009, the Corps issued its final EA ("FEA"), a FONSI, and the Permit.  On that same day, it denied Plaintiff's request for a public hearing on the Project and draft EA.

82.     The FEA with appendices is over 1,650 pages long.  When the Corps' responses to comments are included, the FEA totals over 1,750 pages.

**Deficiencies in the EA and Corps' Decision Not to Prepare an EIS**

83.     The FEA and Corps' decision to not prepare an EIS is deficient in many respects. Among other things, the substantial public controversy created by the Project itself warranted preparation of an EIS.

84.     Further, EPA's conclusion that the Project would result in fugitive dust emissions four to ten times above federal standards warranted preparation of an EIS.  While BNSF entered into a mitigation monitoring agreement with the Kansas Department of Health and Environment after the draft EA was issued in order to monitor and mitigate fugitive dust emissions if they exceed certain thresholds, this agreement lacks the requisite specificity, enforcement, and effectiveness to relieve the Corps of its obligation to prepare an EIS.

85.     Further, the FEA improperly assessed the Project's air quality impacts.  Among other things, the FEA:

        a.     Failed to quantify construction emissions from the Gardner IMF and Logistics Park;

        b.     Failed to quantify greenhouse gases from the Gardner IMF and Logistics Park;

        c.     Underestimated emissions from the Gardner IMF and Logistics Park by, for example, (i) confining estimates of locomotive and truck emissions to those that occur on-site, or at best, just outside the Project site, even though the Project will increase rail and truck traffic

19

throughout the Kansas City region, (ii) failing to quantify emissions from non-truck vehicles, cargo handling equipment, and transportation refrigeration units that will sustain Logistics Park operations, (iii) failing to quantify emissions from all of the cargo handling equipment and transportation refrigeration units that will generate emissions at the Gardner IMF, and (iv) making unsubstantiated assumptions about the age of trucks and other vehicles and equipment that will be used at the Gardner IMF and Logistics Park so as to reduce emissions associated with the Project;

d.      Underestimated the health impacts created by the Project's direct and indirect diesel emissions by among other things, failing to adequately assess particulate matter emissions and the health risks from such pollution, including cancer risk;

e.      Underestimated the cumulative air quality impacts of the Project and other reasonably foreseeable future actions by for instance, failing to quantify the cumulative impacts of the Argentine Yard, Murray Yard, Gardner IMF and Logistics Park operating simultaneously, in addition to other induced industrial operations created by the Project;

f.      Improperly assessed the "no project alternative" by inflating baseline conditions so as to minimize the air quality impacts of the Project;

g.      Improperly assessed the growth inducing impacts of the Project by failing to assess all reasonably foreseeable industrial growth that could occur in the region from the Project; and

h.      Improperly confined its alternatives analysis to examining alternative locations for the Project—failing entirely to consider a Project alternative that encompassed use of less-polluting vehicles and equipment, and other air quality measures that would significantly reduce the Project's emissions.

86.     As a result of these and additional deficiencies in the FEA, the Corps failed to adequately assess the direct and indirect adverse effects of the Project on air quality.  These deficiencies contributed to the Corps' improper decision to not prepare an EIS.

## FIRST CLAIM FOR RELIEF

### (Failure to Prepare an EIS in Violation of the APA and NEPA)

87.     Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraph 1 through 86 herein.

88.     The Corps' issuance of the Permit constitutes a major federal action significantly affecting the quality of the human environment.

89.     As set forth in the preceding paragraphs, the Permit will enable BNSF to construct and operated the Gardner IMF.  This Project and its direct and indirect effects will significantly affect the human environment in the Kansas metropolitan region.  Accordingly, issuance of the Permit is a major federal action for which a full EIS must be prepared.

90.     By granting BNSF the Permit without preparing an EIS, engaging in the public process accompanying preparation of an EIS, and performing analyses as required in an EIS to determine the potential significant adverse environmental effects of the Project, the Corps violated the APA, 5 U.S. C. §§ 701 *et seq.*, by acting arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA, 42 U.S.C. §§ 4321 *et seq.*, NEPA implementing regulations, 40 C.F.R. §§ 1500.1 *et seq.*, and the Corps' NEPA regulations, 33 C.F.R. §§ 230.1 *et seq.*

91.     Unless the Corps prepares a full EIS that considers all potential significant impacts to human health and the environment, identifies mitigation measures to address such impacts, and evaluates a reasonable range of alternatives, Plaintiff and the region will suffer irreparable harm.

92.     Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### (Failure to Prepare an Adequate FEA in Violation of the APA and NEPA)

93.     Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraph 1 through 92 herein.

94.     The Corps' issuance of the Permit constitutes a major federal action significantly affecting the quality of the human environment.

95.     To the extent that the Corps is uncertain as to whether the Project's direct, indirect, or cumulative effects significantly affects the human environment, NEPA's implementing regulations permit the Corps to prepare an environmental assessment to determine whether an EIS is necessary.  An environmental assessment must provide sufficient evidence and analysis for determining whether the Corps should issue a FONSI or prepare an EIS.

96.     As set forth in the preceding paragraphs, the Corps failed to prepare an adequate FEA by failing to analyze all potential significant adverse environmental effects of the Project.

97.     By granting the Permit to BNSF without performing the analyses required in a FEA to determine the potential significant adverse environmental effects of the Project, the Corps violated the APA, 5 U.S. C. §§ 701 *et seq.*, by acting arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA, 42 U.S.C. §§ 4321 *et seq.*, NEPA implementing regulations, 40 C.F.R. §§ 1500.1 *et seq.*, and the Corps' NEPA regulations, 33 C.F.R. §§ 230.1 *et seq.*

98.     Unless the Corps prepares an adequate EA that considers all potential significant impacts to human health and the environment, Plaintiff and the region will suffer irreparable harm.

99.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment:

1.      Declaring that the Corps' FONSI violates NEPA and is therefore invalid;

2.      Declaring that the direct and indirect effects of the Project may have significant environmental impacts, and require an EIS in order to comply with NEPA;

3.      Declaring that the Corps' failure to prepare an EIS violates NEPA and the APA;

4.      Declaring that the Corps' FEA failed to analyze all potential significant adverse environmental effects of the Project;

5.      Declaring that the Corps' FEA violates NEPA and the APA;

6.      Ordering the Corps to prepare an EIS;

7.      Staying the effect of the Permit unless and until the Corps complies fully with the requirements of NEPA and the APA;

8.      Awarding Plaintiffs their costs and reasonable attorney fees incurred in prosecuting this action; and

9.      Ordering such other relief as the Court may deem just and proper.

//

//

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the place of trial of this matter.

Respectfully submitted,

/s/ Melissa Lin Perrella
**NATURAL RESOURCES DEFENSE
COUNSEL, INC.**
***To be admitted pro hac vice***
David Pettit  CA Bar. No. 67128
dpettit@nrdc.org
Melissa Lin Perrella  CA Bar. No. 205019
mlinperrella@nrdc.org
1314 Second Street
Santa Monica, CA 90401
Telephone:  (310) 434-2300
Fax:  (310 434-2399

/s/ Mark V. Dugan
**DUGAN SCHLOZMAN LLC**
Mark V. Dugan  KS Bar No. 23897
                      D. Kan. No. 70685
mark@duganschlozman.com
Heather J. Schlozman  KS Bar No. 23869
heather@duganschlozman.com
7001 W. 79th Street, Suite 102
Overland Park, Kansas 66204
Telephone:  (913) 322-3528
Fax:  (913) 894-1686

**COUNSEL FOR PLAINTIFF**